E4ugnahs

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA

4          v.                         13 CR 268-7(JMF)

5   HILLEL NAHMAD,

6               Defendant.

7   ------------------------------x

8                                     New York, N.Y.
                                      April 30, 2014
9                                     3:00 a.m.

10
    Before:
11
                    HON. JESSE M. FURMAN,
12
                                        District Judge
13

14                        APPEARANCES

15
    PREET BHARARA
16       United States Attorney for the
         Southern District of New York
17  JOSHUA NAFTALIS
    HARRIS FISCHMAN
18       Assistant United States Attorneys

19  BRAFMAN & ASSOCIATES
         Attorney for Defendant
20  BENJAMIN BRAFMAN
         - and -
21  ZUCKERMAN SPAEDER, LLP
         Attorney for Defendant
22  PAUL SHECHTMAN

23  ALSO PRESENT: ROBERT HANRATTY, FBI Agent

24

25

E4ugnahs

1          (Case called)

2          MR. NAFTALIS:  Josh Naftalis and Harris Fischman for

3     the government.  With me at counsel table is Robert Hanratty

4     from the F.B.I.

5          THE COURT:  Good afternoon, to all of you.

6          MR. BRAFMAN:  Benjamin Brafman.

7          MR. SHECHTMAN:  Paul Shechtman, your Honor.  Good

8     afternoon.

9          THE COURT:  Good afternoon, to both of you.

10         MR. SHECHTMAN:  Mr. Nahmad is present.

11         THE COURT:  Good afternoon to you, Mr. Nahmad.

12         We are here today for purposes of sentencing.  In

13    preparation for today's proceeding, let me go over what I have

14    received and reviewed because it seems to have increased by the

15    hour over the last few days.

16         Number one, I received the presentence report dated

17    April 23, 2014.  I have also received and reviewed the

18    following additional submissions:  The defendant's submission

19    filed on April 15, 2014, which included 65 letters addressed to

20    me from the defendant, his parents, his siblings, various

21    employees and ex-employees and various friends and

22    acquaintances, including dozens of letters from figures in the

23    art world, including people at Sotheby's and Christie's.

24         I have received the defendant's submission responding

25    to the government's submission dated April 28, 2014, as well as

1  the attachments to that submission, which include some

2  documents, primarily financial documents, as well as a letter

3  from Howard Shaw addressing the value of *Carnaval à Nice,* the

4  painting at issue or at least partially at issue in this case.

5         Finally, I received the defendant's sur sur-reply, if

6  you will, of April 29 from yesterday.  I have also received and

7  reviewed the government's submissions filed on April 23, 2014

8  and its sur-reply dated April 29, 2014, as well as the

9  attachments to those submissions.

10         In addition to those, I have listened to the call

11  intercepted on March 22, 2012, between Mr. Nahmad and

12  Mr. Hirsch that I directed the government by order this morning

13  to submit to me in advance of sentencing.  I will designate

14  that call Court exhibit one, and it will be retained in the

15  possession of the government.

16         I have one question about that.  The recording

17  references the acquaintance at issue by name, albeit only by

18  first name.  I don't know if that needs to be redacted or if

19  the parties feel that should be redacted in the event that it

20  is made publicly available.

21         Counsel.

22         MR. BRAFMAN:  Your Honor, I leave it to your Honor.  I

23  have no strong feeling either way.  I think in fairness to her

24  it should be redacted, but it's really the government's call.

25  It's their recording.

E4ugnahs

1          MR. NAFTALIS:  We agree, your Honor, that it should be

2    redacted to the extent I guess it's possible on a rerecording.

3          THE COURT:  I will order that it be redacted in the

4    event that it is made publicly available; that is, redacted

5    solely to remove the first name of the acquaintance, and

6    otherwise, it's designated as Court exhibit one.

7          In addition, I have received, and counsel and the

8    parties are aware of this, two anonymous letters, one on March

9    18, 2014 and one on April 28, 2014, which are currently filed

10   under seal.

11         I did direct counsel to be prepared to address whether

12   and to what extent those letters should be released publicly

13   and I would now be happy to hear from you on that.

14         MR. BRAFMAN:  Yes, your Honor.  Thank you.

15         I think they should remain sealed.  I think it's

16   impossible to respond to a letter written by someone who

17   doesn't have the courage or the integrity to sign their name to

18   it.  It's impossible to respond.

19         I think a letter like that would never be admitted

20   into court.  A letter like that would probably not even be

21   published in the newspaper without being able to verify that

22   this doesn't come from someone who has a grudge or a jealous or

23   is a competitor, so I'd ask that they remain sealed.

24         I adopt a Rule 403 argument.  I think there's no

25   probative value, and I think the potential prejudice, not to

1  the Court, because I think you will not hopefully consider an

2  anonymous letter in deciding what your sentence is, but we've

3  had enough adverse publicity in this case that I think it's

4  somewhat unfair and I'd like to avoid more that we can't

5  respond to.

6          THE COURT:  To be clear, I don't think the issue is

7  the admissibility for the evidentiary value of it so much as

8  whether it constitutes a judicial document as to which there's

9  a public right of access.

10         MR. BRAFMAN:  I understand.  I use the Rule 403

11  analogy not because it's going to be admitted, but I think in

12  fairness to the defendant, it shouldn't be published because if

13  it were released, I don't think a newspaper could publish it,

14  to be perfectly candid, because no one signs it and you can't

15  attribute it to anyone.

16         I ask that you respectfully keep it sealed for now.

17  If some publishing agency decides they want to file a motion to

18  unseal it, we could live to discuss that another day hopefully

19  and address it, if necessarily, by briefing.  I spoke briefly

20  to the government about it.  I think they feel the same way,

21  but let them speak for themselves.

22         THE COURT:  Mr. Naftalis.

23         MR. NAFTALIS:  Just because someone wrote to you

24  doesn't, in our view, mean it becomes a part of the record.

25  We're not asking your Honor to attach any weight to these

E4ugnahs

1  letters.  We don't think that they need to be unsealed.  We

2  recognize the right of access issue.

3  MR. BRAFMAN:  It's hard to hear.

4  MR. NAFTALIS:  Just because you're writing in, doesn't

5  mean it automatically becomes part of the record that should be

6  docketed.

7  THE COURT:  I am going to maintain them under seal.  I

8  am very familiar with the standards that apply to judicial

9  documents and public access and the first step in the analysis

10  is what weight, if any, the public access has.

11  Here, I do not intend to place any weight on the two

12  anonymous letters that I received; and in that regard, other

13  than they were technically filed with the Court, I'm not sure

14  they constitute judicial documents to which there is a public

15  right of access.

16  In any event, I will reserve judgment on that decision

17  ultimately.  If there's any motion by anyone else to unseal

18  them, then we can address it, but for now, I think there's an

19  adequate basis to keep them under seal.

20  Mr. Brafman, have you read the presentence report?

21  MR. BRAFMAN:  Yes, your Honor.

22  THE COURT:  Have you discussed it with Mr. Nahmad?

23  MR. BRAFMAN:  Yes, your Honor.

24  THE COURT:  Mr. Nahmad, have you read the presentence

25  report?

E4ugnahs

 1           THE DEFENDANT:  Yes, sir.

 2           THE COURT:  Have you discussed it with Mr. Brafman

 3      and/or Mr. Shechtman?

 4           THE DEFENDANT:  Yes, I have, sir.

 5           THE COURT:  Have you had enough time to go over with

 6      them any mistakes in the report or anything that you would want

 7      to bring to my attention in connection with your sentencing?

 8           THE DEFENDANT:  Yes, sir.

 9           THE COURT:  Mr. Naftalis, have you reviewed the

10      presentence report?

11           MR. NAFTALIS:  Yes, your Honor.

12           THE COURT:  Putting aside the calculation of the

13      sentencing guidelines for a moment, are there any objections to

14      the report with respect to its factual accuracy?

15           MR. NAFTALIS:  No, your Honor.

16           THE COURT:  Mr. Brafman.

17           MR. BRAFMAN:  Your Honor, the answer is no.  To the

18      extent, however, it quotes from sections of the indictment that

19      we do disagree with, we obviously have previously indicated so

20      in our submissions, but we do not find any mistakes that we

21      need to correct at present.

22           THE COURT:  I'm not sure if that qualifies as an

23      objection or not, but it doesn't sound like it.

24           MR. BRAFMAN:  It doesn't, but I do have one thing I

25      think in fairness to your Honor that I want to point out, even

E4ugnahs

1    though to some extent I could use it to suggest something that

2    I don't think was intended.  I'm hopeful that the Court decides

3    its own sentence in this case and not follow the recommendation

4    of probation, but the ultimate recommendation of probation is a

5    six months' sentence and six months' home confinement.

6           I have read this so many times, but it only occurred

7    to me the other day:  If you look at page 26, there is an

8    initial recommendation by the probation officer in the second

9    full paragraph in which the probation officer recommends three

10   months' imprisonment and three months' home confinement.  The

11   official recommendation switches to six months.

12          I'm not making an issue of it, but I wanted to bring

13   it to the Court's attention so that you can either correct it,

14   leave it, but that's something I don't think should slip by.

15          THE COURT:  I noted the discrepancy.  Ultimately, I

16   don't think it matters.  It's their recommendation.

17          I will impose the sentence that I think is

18   appropriate, but I appreciate you bringing it to my attention.

19          MR. BRAFMAN:  Yes, sir.

20          THE COURT:  Hearing no objections to the presentence

21   report, I will adopt the factual recitations set forth in the

22   report, which will be made a part of the record in this matter

23   and placed under seal.  If an appeal is taken, counsel on

24   appeal may have access to the sealed report without further

25   application to me.

E4ugnahs

1      As counsel are aware, I'm no longer required to follow

2  the United States Sentencing Guidelines, but I am required to

3  consider them in imposing an appropriate sentence and must

4  therefore begin by accurately calculating the guidelines range.

5      In this case, there was a plea agreement in which the

6  parties stipulated to a particular calculation of the

7  guidelines.  Am I correct that the calculation in the

8  presentence report is consistent with the parties' agreement?

9      Mr. Naftalis.

10      MR. NAFTALIS:  Yes, your Honor.

11      THE COURT:  Mr. Brafman.

12      MR. BRAFMAN:  Yes, your Honor.

13      THE COURT:  Thank you.

14      Based on the parties' agreement, the absence of

15  objection, and my independent evaluation of the guidelines, I

16  therefore accept the guidelines calculation set forth in the

17  presentence report.

18      Therefore, using the November 2013 edition of the

19  guidelines, I find that the total offense level is 13, the

20  Criminal History Category is I, the guidelines range is 12- to

21  18 months in prison, and the fine range is 3,000- to $30,000.

22      In the plea agreement, both parties also agreed not to

23  seek a departure from the guidelines range; that is, a

24  departure within the advisory guidelines system and as distinct

25  from what has become to be known as a variance.

1           Is that correct, Mr. Naftalis?

2           MR. NAFTALIS:  Yes, your Honor.

3           THE COURT:  Mr. Brafman.

4           MR. BRAFMAN:  Yes, your Honor.

5           THE COURT:  I have nevertheless considered whether

6   there is an appropriate basis for a departure from the

7   guidelines range and do not find that there are any grounds

8   that would warrant a departure.

9           Having settled all of that, Mr. Naftalis, do you wish

10  to be heard or Mr. Fischman, for that matter, do either of you

11  wish to be heard with respect to sentencing?  I'm assuming the

12  answer is yes.  Given that, let me ask you to address a few

13  things in the course of your remarks.  I would also ask you,

14  just to aid everybody in hearing, that you speak from the

15  podium.

16          Number one, you know full well from prior sentencings

17  in this case that I am keenly interested in figuring where

18  defendants stand in the ladder of culpability, if you will.  I

19  want you to address how you think Mr. Nahmad compares to two

20  defendants in particular, one is Mr. Zuriff, the first person I

21  sentenced in this case, and the second is Mr. Siegel.

22          In particular, in his initial sentencing memo,

23  Mr. Nahmad essentially depicts Mr. Siegel as the driving force

24  or leader, if you will, of their little gambling operation and

25  suggests that he was just providing financial backing to what

E4ugnahs

1    was, in essence, Mr. Siegel's operation.  That is very

2    different than the sense I got from Mr. Siegel's sentencing and

3    the record that was presented to me at that time and would just

4    ask that you address that.

5            Next, Mr. Nahmad has, and I think you will address

6    this, but essentially has taken the position that he was

7    involved in sports gambling, and it wasn't until 2012 that it

8    crossed the line into illegality when he started essentially

9    booking some or a handful of bets; I would like you to

10   specifically address that, and, in particular, the argument

11   that until 2012, what he was doing was in compliance with the

12   law.

13           Number four, there doesn't seem to be any argument

14   that a leadership enhancement applies, and, obviously, it was

15   part of the stipulated sentencing guidelines range set forth in

16   the plea agreement, but if you could address the call quoted at

17   page 20 of the defendant's memorandum, the April 19, 2012 call

18   I think it is in which Mr. Illya Trincher essentially says that

19   Mr. Nahmad has no decision-making authority, and to what extent

20   that call does support the defendant's argument that, while he

21   was a leader in the sense of providing financial support and

22   backing to the operation, he didn't have operational or

23   decision-making leadership.

24           If you could address those and whatever else you want

25   to address, I would appreciate it.

E4ugnahs

1        MR. NAFTALIS:  Could we have one second.

2        THE COURT:  Absolutely.

3        MR. NAFTALIS:  Working through the issues, with

4   respect to Mr. Zuriff and Mr. Siegel, Mr. Siegel was Mr. Nahmad

5   and Mr. Trincher's employee.  And the general theme you'll hear

6   from the government is, notwithstanding the plea, the defendant

7   is backing away from accepting responsibility.

8        What he is doing is trying to push Siegel ahead, that

9   he is the driving force of this operation and he is just

10  getting used by everyone.  That's the theme.  We don't think

11  that's the case.  He was an equal financial partner with Illya

12  Trincher.  Mr. Siegel had what appears to be, and we don't have

13  any reason to dispute it, some sort of a sliding-scale of

14  interest, but certainly nothing like Mr. Nahmad and

15  Mr. Trincher who had between 40- and 47 percent.

16       Mr. Siegel was a handicapper, a sharp bettor, but he

17  wasn't booking the bets.  He provided a service to them, which

18  was his acumen, but the business was driven, operated, financed

19  by Mr. Nahmad and Mr. Trincher.

20       Mr. Zuriff ran his own sports book.  We recognize

21  that.  It's not like the operation that's going on here, which

22  is millions and millions of dollars flowing through Mr. Nahmad

23  and Mr. Trincher's illegal gambling business.

24       The focus of the government's investigation, and

25  there's been no secret, is it wasn't on the west coast

1    gambling; it was on the east coast gambling.  Mr. Zuriff did

2    admit to running a sports book, but he pled guilty to different

3    conduct and the proof is of a different nature.  To answer your

4    Honor's question directly, our view is that Mr. Nahmad is more

5    culpable than Mr. Zuriff and Mr. Siegel.

6            With respect to your Honor's question about when the

7    sports gambling began, again, this was in our reply submission.

8    The defendant wants to disaggregate or ignore the full scope of

9    his conduct.  The government's wiretap investigation began in

10   2012, which is why the best evidence of them booking bets is

11   2012.  That's it.  We don't concede that what they were doing

12   prior to 2012 was legal.  They wanted to be legal.  They keep

13   saying we're just bettors.  They're moving massive amounts of

14   money, using illegal websites and generally running a gambling

15   business that, in our view, violates the law and it cannot be

16   separated.  We don't agree that the business necessarily was

17   legal before 2012.

18           What happens, as your Honor knows, you begin an

19   investigation, and the proof gets better when you start doing

20   it.  They wanted it to appear as though it is just betting and

21   that they are not laying off bets and doing everything that we

22   disagree.  They don't think that they're laying off bets.  We

23   very much think they're laying off bets.  They like to call

24   themselves not a run-of-the-mill bookmaker, so they are not

25   like Mr. Zuriff who is a more traditional bookmaking, but they

1  booking bets and using all of the tools of bookmaking, meaning

2  with Pinnacle up for accounts, wiring money internationally,

3  including from Switzerland to New York to Taiwan, all of that

4  is illegal.  None of it is legal.

5          The leadership enhancement, again, this comes back

6  to the prior point which is the defendant wanted to plead

7  guilty.  This was the resolution.  He gets four points.  He

8  agreed to it.  Now, in his submissions, he is backing away.

9  The call that is cited at page 20 as we have told the defense

10  counsel, it's no secret, Mr. Nahmad did not have a good

11  reputation in the gambling community or generally.  People did

12  not want to do business with him.  How did Mr. Trincher deal

13  with it?  Push Helly aside saying he's not working with us.

14  Don't worry.  Keep sending us your business.  This is

15  coconspirators fighting with each other.  This is not

16  Mr. Nahmad being used.

17          If you read all of the calls, which your Honor is

18  welcome to do, but it's very clear this was cherry-picked out.

19  As we cited in our first submission, they are exchanging their

20  P&Ls, or profits and loss, with the business, they are

21  exchanging emails, they are recruiting clients, and Mr. Nahmad

22  himself is booking bets.  So, the fact that Mr. Trincher wants

23  to bad-mouth Mr. Nahmad to try to move the business doesn't

24  mean that Mr. Nahmad is somehow not culpable.

25          He certainly had decision-making authority.  As the

E4ugnahs

1    defendant agreed, his primary role, as we have said, is

2    providing the financial backing, that's the primary reason he

3    got the leadership points, but he certainly was doing

4    everything else involved.

5         A lot of people in the room weren't here this morning,

6    but the fact that you happen to do one thing more than the

7    other doesn't mean you didn't do both; meaning the fact that

8    you happened to bring more of the money to the table doesn't

9    mean you also weren't doing the bookmaking.  His skill, to the

10   extent it's a skill, is to the effect that he had his family

11   money which he could inject into the business.  So, he had

12   decision-making authority, he had the money, and he was a

13   partner and very close friends with Illya Trincher.

14        It's a fiction to say that somehow these guys, who are

15   sending millions and millions of dollars back and forth with no

16   contracts, somehow are not friends and they're not in business.

17   It is an effort to minimize the conduct.  And we very much take

18   issue with the claim throughout honestly the submission, the

19   defendant's second submission, which is basically walking away

20   from everything he pled guilty to, which is why we have five

21   sentencing submissions, which is unusual.

22        Overall, I think we have covered it.  It's our view

23   that the defendant should get a guideline sentence.  He pled

24   guilty.  He's one of the only two people to get four leadership

25   points.  I think your Honor is going to ask, how did this

E4ugnahs

1    resolution come about?

2           The guidelines, as we have discussed, don't make any

3    sense.

4           THE COURT:  To interrupt for a moment, I think he is

5    one of two people who got them from you, but I have now imposed

6    them in two cases where you did not seek them.

7           MR. NAFTALIS:  Any other plea in this case, you end up

8    actually with lower guidelines.  The argument that he didn't do

9    other things I think falls flat.  It's very much relevant

10   conduct.  We think we could have proved it, which is why we put

11   it in here.  We think your Honor is entitled to know what the

12   investigation revealed with respect to what the defendant was

13   doing.  It wasn't just I'm getting used for my money.  He's

14   ripping off a friend.  He's booking bets with other people to

15   rip off someone who was in rehabilitation.  He is engaging in

16   massive amounts of what we believe would constitute

17   international money laundering, sending money from Switzerland

18   into the United States to promote a business.  That is

19   Black-letter promotional money laundering.

20          So to say I am just the guy getting paid, my dad is

21   paying my debts, and I got used by my friend ignores what he

22   pled guilty to.  Overall, this is a multimillion-dollar illegal

23   business.  It went for the full scope as to what he pled guilty

24   to.  It did not start in 2012.  He is not just the pawn, the

25   rich kid getting used.  He is a sophisticated individual.  He

1    has it both ways.  He's the sophisticated art man who is doing

2    millions and millions of deals but he's getting used by his

3    friend.  That doesn't make any sense.

4         A few other points and then we'll sit down.  We

5    recognize that the entire art community came out in favor of

6    Mr. Nahmad.  These are his business associates.  I see very

7    little in the way of friends.  I see very little in the way of

8    people saying he did good thing for me.

9         We know Noah Siegel.  Your Honor will remember Noah

10   Siegel went out of his way to turn his life around immediately.

11   He is volunteering every day.  Mr. Nahmad says in place of

12   jail, I'll do something, I'll set up a foundation, something

13   like that.  He hasn't done anything until now.

14        He doesn't have any letters from good deal deeds,

15   charity, people he has helped.  It's a bunch of people saying

16   you sent business my way and you're trustworthy.  Quite

17   honestly, the government's investigation has revealed that that

18   trust was breached on at least one occasion.  We think it's

19   black and white on the page.  This is not spoofing.  This is

20   someone ripping off a friend because it's easy.  If he remains

21   in the art world, if he assigns a price to a painting, that's

22   what people pay, and they have no ability to push back.

23        To bring it all around, that transaction was illegal

24   any way you cut it, three, four, five different ways.  So it

25   doesn't lend any credibility to the argument that he is getting

1  used, he is not sophisticated, and he's just the guy getting

2  pushed around because he's the guy with the deep pockets.

3          We're happy to answer any other questions.

4          THE COURT:  That's fine.  Thank you.

5          Mr. Brafman, do you wish to say something?

6          MR. BRAFMAN:  Yes.  If I may speak from here.  I have

7  too many papers for the podium.  I don't believe any Court in

8  the history of my career has told me that they could not hear

9  me.  I will keep my voice up, sir, with respect, but if you

10 insist on the podium, I will.

11         THE COURT:  That's quite all right.

12         MR. BRAFMAN:  I was part of a sentencing commission,

13 and I asked a group of federal district judges does what the

14 counsel say in the well of the courtroom matter when you know

15 you're before a Court who has definitely read everything you

16 submitted and you submitted everything that you wanted to

17 submit.

18         To a person, every judge on that panel said to me you

19 do your job.  Don't assume that what you say does not matter.

20 Many judges want to hear what you have to say.  In particular,

21 in a case where you think there is a tough decision to be made

22 by a Court, you are an advocate; you have that obligation.

23 Second, you have an obligation to your client.  Because today,

24 20 minutes after we are done, anybody who wants to, can order

25 this transcript.

E4ugnahs

1    It is very important that the record not only contain
2 what the government thinks Helly Nahmad did bad, but it also
3 contain our explanation and also all of the wonderful things
4 that he has done.

5    I'm somewhat stunned by a few of the things that
6 Mr. Naftalis said, but before I say that, I want to make one
7 observation.  I don't think you can find two criminal defense
8 lawyers in the country, much less in New York, who have greater
9 respect for the Southern District and despite the fact that we
10 fight with them every day as advocates and adversaries.

11    But what we don't do, we don't trash the government
12 simply because we think it gets you someplace.  I'm not going
13 to do that.  I'm going to argue respectfully.  I have great
14 respect up until last night for my two adversaries and still
15 grudging respect, but I want you to understand something
16 because I think it's very important even though it's not
17 mentioned.

18    For them to suggest that Helly Nahmad has not done
19 anything since he got indicted is just absurd.  One of the
20 things I have spoken about, quite frankly, to the criminal
21 division, is the role of the defense counsel.

22    For the last ten months, Helly Nahmad has spent more
23 time with me and Mr. Shechtman than with anybody else, and when
24 he wasn't there he was at the gallery.  To the extent that when
25 you come into a case like this, we have adopted him.  I'm old

E4ugnahs

1  enough to be his father.  But when I met Helly Nahmad, the

2  world, the European press, the world press was being told he

3  was a gangster, that he was an extortionist, that he was a

4  racketeer, and he was never any of those things.

5        We had to save him and restore his pride and restore

6  his ability to function.  I didn't want him to hang himself and

7  I didn't want him to go into despair, and I didn't want his

8  business to fail.  So, we had an obligation to sit with him.

9  And this isn't a question of billing him for time because I'm

10  not even billing him on an hourly basis.  This is a question of

11  he is a good person, he has screwed up, and he's worth saving,

12  and we saved him.

13        So, for them to suggest that Helly Nahmad did not

14  teach children to play chess in the last ten months and

15  therefore you should punish him for that, I represent to you

16  that he has listened to 3200 telephone calls in this case; that

17  we have listened to many of them with him so that he could

18  explain it to us.  And I dare say that if the government

19  listened to those calls with someone who could explain the

20  calls to them, there would be far different submissions than

21  the government has put in.

22        I respect Harris Fischman.  We met in this case.  He

23  said something very interesting during the sentencing of

24  Michael Sall.  You'll forgive me.  I have memorized all of the

25  defendants that you have imposed in this case for the different

E4ugnahs

1   defendants, and I have done it for reasons which you will see I

2   think are very important to this process.

3          But in the sentencing of Mr. Sall, I think Mr. Sall,

4   if you look at the indictment, is higher in the caption than

5   Mr. Nahmad.  At the end of the day, when he was being

6   sentenced, Mr. Fischman candidly stood up and he said your

7   Honor, when a prosecutor is working on a case, you have a

8   perception.  And then when you have the benefit of time and you

9   step back, I'm paraphrasing, when you step back, you look and

10  you maybe see a defendant in a different light.  To his credit,

11  that's an appropriate thing to do.

12         In the sentencing of Michael Sall, your Honor imposed

13  a nonjail sentence.  And I understand the facts are different.

14  He's 69, he's an army veteran.  But at the end of the day, when

15  this case started, he was right up there in the masthead as a

16  R.I.C.O. defendant.  Now, what Mr. Naftalis has essentially

17  said is that by our submissions on behalf of Mr. Nahmad, he is

18  somehow stepping back from acceptance of responsibility; that

19  if lawyers who really understand the case are submitting to a

20  sentencing Court arguments as to why the government's proof is

21  wrong, not that they're bad, not that they made it up, not that

22  they're doing anything illegal or inappropriate, but there is a

23  perception that they have given you, in certain cases which,

24  with the benefit of hindsight, I submit most respectfully, is

25  wrong.  And it's wrong because there was no cooperator, as

1    Mr. Fischman told you, who was able to sit down and explain it

2    to them.  Instead, they had an agent who was listening to these

3    tapes who assumed everything was exactly what it appeared to be

4    and at the end of the day, here is where we are.

5            While we disagree with them vigorously, it isn't a

6    question of disparaging the Southern District or making

7    arguments that aren't supported by the facts.  All of our

8    arguments are supported by the facts.

9            Your Honor, one of the things that you have focused on

10   in a number of different sentences, and defense counsel said it

11   and you said it, sir, yourself, that you made an observation

12   that to the extent that some defendants pled early, it's an

13   indication of acceptance of responsibility.  In, at least, four

14   or five places in the record, the defense lawyer said it and in

15   imposing sentence, your Honor noted it.

16           Mr. Nahmad pled early, but Mr. Nahmad could not plead

17   until two lawyers who really take their job responsibly had

18   been able to listen to all of the conversations and then could

19   go to the government and tell them this is wrong.  We're not

20   letting him plead guilty to this, this or this because we don't

21   believe he committed the crime.  We don't believe you committed

22   the crime and we don't believe in a million years that you

23   could prove beyond a reasonable doubt.

24           Mr. Naftalis opened this door.  I'm not driving

25   through it.  I've never violated Rule 11.  I don't intend to

1    violate it now.

2          Mr. Naftalis mentioned the plea process.  This plea

3    process took months.  It went through meeting after meeting

4    after meeting with Mr. Fischman and Mr. Naftalis with their

5    section chiefs, with the chief of the criminal division and

6    ultimately with the U.S. Attorney himself, because we wanted

7    the U.S. Attorney to understand that what you have charged him

8    with is not what we believe he did.  And what we believe he did

9    was this:  It's gambling.  Ultimately we agreed, he said that,

10   we agreed to accept the leadership points.  It's something that

11   I am not walking away from.  It makes a huge difference, I

12   believe, to a sentencing Court.

13         I have never seen a carve-out in a plea agreement in

14   37 years where the leadership points is related solely to being

15   the financial end with the exception of drug cases where there,

16   it doesn't matter.  If you finance a drug deal, you're as

17   guilty as the people who import the drugs in most people's

18   opinion, including my own.

19         In this case, we agreed to accept leadership points.

20   To Mr. Fischman's credit, without his persistence, I'm not

21   certain this case ever gets resolved.  We're here.  Here is

22   what I was relying on, and here is what Mr. Shechtman and

23   Nahmad was relying on.  You said it in the sentencing yesterday

24   of Mr. Golubchik, and it's raw, that transcript.  I didn't

25   memorize it, but there's a quote in there from your Honor.

1      You said that your job, and I agree, your job is not

2  to determine whether the leadership points were properly

3  negotiated, whether they should apply or should not apply.

4  You're not bound by the plea agreement.  Your job is to apply

5  truth in sentencing.  And I don't know if those are the exact

6  words, but that's pretty much what the Court said.  And that's

7  all I'm asking you for.

8      To the extent that other defendants got credit and

9  pleas implicitly from pleading guilty early, we pled guilty

10  early.  We're not being sentenced early because we went through

11  significant sentencing submissions that took a long time to

12  write and then rewrite and then submit and respond to.  The

13  reason why we responded to them, Judge, is the same reason I'm

14  responding to what Mr. Naftalis said, because even today, I

15  don't think they're willing to concede the distinction between

16  betting and running a gambling business.

17      While your Honor has not conceded as a matter of law

18  that it's okay to gamble, in several sentences, your Honor has,

19  at the very least, said candidly and openly that there is

20  sufficient ambiguity in the law.  You have taken pleas from

21  people who, at the time of their sentencing, didn't want to

22  acknowledge that they knew what they were doing was wrong and

23  the fact that they have turned a blind eye.

24      You took pleas from Mr. Oratz and others in which they

25  were essentially saying I didn't know what I was doing was

1    illegal.  And you, at the time in sentencing those people, said

2    candidly he should have known.  We didn't do that.

3         Mr. Nahmad candidly admitted that at some point he

4    crossed the line and he went from a club of people betting with

5    each other into bookmaking.  He didn't walk away from that.

6    And for Mr. Naftalis to say we know it must have started early

7    but we can't prove it to you, that's not fair.  That's asking

8    you to draw an inference that is not supported by any facts.

9    There is not a scintilla of evidence to suggest that prior to

10   2012 we booked anyone.

11        We did the investigation that I think the government

12   should have done.  We checked with the people who were actually

13   doing the booking with these people.  And in 3200

14   conversations, your Honor, in 3200 conversations, over the six

15   or seven years that they say this operation worked, there are

16   five or six people, all of them billionaires, who, at some

17   point, bet with this betting organization and in that way we

18   crossed the line.

19        So, what Mr. Nahmad said at his plea was true, and why

20   is that important?  It's important because at the time he

21   became the finance person, it was a club.  It was not illegal

22   betting.  Mr. Shechtman and I believed that we are right on the

23   law and we have not found a Court of late who has disagreed

24   with us.  There is no one who has ever been prosecuted by New

25   York State for placing a bet, even if they placed a bet with an

1    illegally bookie.

2            THE COURT:  Can I interrupt you for a second,

3    Mr. Brafman, because there is a difference between the

4    defendants that you have cited and the position that you have

5    taken in connection with the sentencing.

6            Those defendants said we were not aware at the time

7    that what we were doing crossed the line into illegality, but

8    we fully concede, now that we have an understanding of the law,

9    that it was illegal.  Hold on.

10           You have taken the position in your sentencing

11   submissions that, putting aside the bookmaking as to which

12   Mr. Nahmad pleaded guilty, that he did not do anything else

13   illegal period, and certainly nothing illegal prior to 2012.

14   That strikes me as a slightly implausible claim given his

15   involvement in Pinnacle, given his involvement in making bets.

16           It may well be legal for a friend of mine and me to

17   make a bet on the Super Bowl and not use interstate wires and

18   the like, but as far as I know, it is illegal to transmit

19   wagering information in interstate commerce and using

20   interstate facilities.  It is illegal to engage in internet

21   gambling.  As far as I can tell, the record is clear that your

22   client did that and then was involved in transmission of money

23   from outside the United States to promote those activities.

24           He pled guilty to what he pled guilty to, but it does

25   go to whether he is denying or embracing what he did which I

E4ugnahs

1  think distinguishes him from the other defendants that you have

2  cited.

3           MR. BRAFMAN:  Can Mr. Shechtman respond for a moment.

4           THE COURT:  Sure.

5           MR. SHECHTMAN:  I'll go there because my voice isn't

6  as loud.

7           Judge, this is an issue that's been in this case from

8  the beginning, and it's one where Mr. Brafman and I differ

9  greatly from the government and differ from the position that

10  you just articulated, which is, my understanding of both New

11  York law and federal law is that betting is lawful.  And that

12  is true whether you are betting you and I or betting with a

13  bookmaker.

14           You only violate New York law if you are working with

15  that bookmaker to advance his bookmaking activity.  Pinnacle is

16  a bookmaker.  It is, to be sure, an internet bookmaker, but it

17  is a bookmaker.  It is unlawful for it to be in that business,

18  but it's not unlawful to bet with Pinnacle.

19           Indeed, if you look at the legislative history of the

20  2006 Act, we're not charged with a 2006 Act, but it informs a

21  lot of this, there was discussion of penalizing betting on the

22  internet.  And the answer was, look, those are the victims and

23  there's passage after passage about college students betting

24  and the like.

25           To me, the only question here is these folks bet with

1    sophistication.  They bet with algorithms.  They bet with Noah.

2    And they bet as a group.  But betting, whether it is just you

3    and I or whether it is you, I and Pinnacle, I don't think is a

4    state crime or a federal crime.

5         If Mr. Nahmad had come to us, maybe we're guilty of

6    malpractice, but if he had come to us, we would have told him

7    that, and we continue to tell him that and we continue to tell

8    the Court that.

9         I know of no decision by any Court in this country

10   that has held that to bet on the internet violates, whether it

11   is the earliest of these provisions, whether it's 1955, whether

12   it is the 2006 Act.  All of those acts say bettors don't count.

13        So, when you count the five people for the crime that

14   Mr. Nahmad pled to, we know you don't count the bettors.  Were

15   Pinnacle to be indicted, we know you wouldn't count the

16   bettors.

17        It matters enormously to us, Judge, because our view

18   is prior to 2013, and one can almost mark the date because the

19   first person they, quote, booked is a person that they bet for

20   the first time in the Super Bowl and that tape is available,

21   and prior to that date, they were betting.  They were betting

22   on what was an unlawful site, but they were betting.  And the

23   money that was coming in from Davide Nahmad was to support it.

24        I think it's of great importance here that betting,

25   betting as a group, is lawful.  If we're wrong on that, all I

E4ugnahs

1  can say to you is the following:  I can't find any authority to

2  the contrary.

3          THE COURT:  The elements of Title 18, United States

4  Code, Section 1084, transmission of wagering information in

5  interstate commerce.  The defendant was engaged in the business

6  of betting and wagering.

7          Do you acknowledge that Mr. Nahmad was engaged in that

8  prior to 2012?

9          MR. SHECHTMAN:  I would not for the following reason:

10 If you look at the cases on the business, all of them say that

11 the business means bookmaking, including Second Circuit cases.

12 So I wouldn't acknowledge it.

13         The other thing you know for certain, and, look, think

14 of this as Molly Bloom sitting at a table and she's taking the

15 rake.  What we know is everybody else at the table isn't doing

16 anything illegal, right.  So I wouldn't acknowledge it.

17         The other thing that's clear about that statute is it

18 incorporates state law.  If it incorporates state law, you know

19 the bettor can't be doing anything wrong because state law says

20 the bettor can't be doing anything wrong.

21         Respectfully, I don't.

22         THE COURT:  Mr. Brafman, yes.

23         MR. BRAFMAN:  To finish off that topic, 1084, relying

24 on the state penal statute, the state penal statute defines a

25 gambling business as a gambling business that's generally open

to the public.

This was not advertised. We did not invite people. People who knew one of our employees who gambled with them in Las Vegas, who gambled with them in backgammon, knew them, knew that we were betting and asked at some point to bet.

The amount of people involved like Brian Zuriff, you asked Mr. Naftalis to discuss culpability. Brian Zuriff has been a classic bookmaker for 20 years earning millions of dollars over that time. If you go to any hotel in L.A. or any valet person and say you want to bet on the Super Bowl, they tell you call Beefy. To the extent they didn't indict him in the Southern District of New York, that's a classic bookmaker. Mr. Nahmad was a classic bettor, and I'll get more to that in a moment.

I want to talk about something that's in this case, and I want to talk about the transcript which your Honor talked about. I think it's very, very important. I'm glad your Honor asked to hear that tape because I think it shows you that when you listen to the tape and you understand what's being said, not just listen to the words, I think you get a very different impression and you understand why we call it spoofing.

Helly Nahmad and Nicky Hirsch have known each other for 25 years since they were ten years old. They play movie roles with each other. In almost every movie role, Mr. Hirsch is the Woody Allen stereotype, if you will, and Mr. Nahmad is

E4ugnahs

 1  either Al Pacino or Robert De Niro or someone who is going to

 2  be the law and order kind of guy.

 3          Let me explain two things to you:  One, out of 3200

 4  conversations, that's a lot, where they're listening to Helly

 5  Nahmad 15 hours a day, you will find the following.  For 12 or

 6  14 hours of that day, he is doing art and he's doing it on a

 7  high end and he's doing it well.  Second, he is not gambling,

 8  and when he's gambling, he's asking Noah, Noah, who just got

 9  probation, he's asking Noah, who I should bet with.

10          Some of the calls are almost sad, your Honor, because

11  Helly is calling Noah repeatedly until Noah complains and we

12  cite that in our brief, stop bothering me.  Helly is supposed

13  to be the boss and Helly calls because he doesn't know who to

14  root for.  He has no idea who they're even betting on, and he

15  could spend the rest of his life trying to understand the

16  algorithm that this chess master put together.  And perhaps the

17  only person I know on this side of the table who will

18  understand it is Paul Shechtman, because I couldn't understand

19  it, but Helly is calling in to ask who to root for.

20          Out of the 3200 conversations, there's a very

21  embarrassing conversation.  To be perfectly candid with you, at

22  first blush, it's a devastating conversation.  And in

23  sentencing in sentencing Nicky Hirsch, your Honor said that it

24  sounds like reprehensible conduct.

25          I point out the following respectfully:  This person,

E4ugnahs

whose name I won't mention, the woman whose money this is, is the Nicky Hirsch's girlfriend. Helly never met her or hasn't met her in connection with this. I don't know if he's ever met her. Secondly, Hirsch came to Helly. Hirsch came to Helly with this stupid proposition. And he should have said Nicky, I don't want to involve you.

But I want to tell you one thing which they have not responded to. We put in an expert who told you respectfully that Dufy was worth at least $300,000. Comparable, these have sold at auction for 3-, 350-, $400,000. And instead of bringing their own expert to say nonsense, what they say is how can you rely on Mr. Shaw? Mr. Shaw wrote a letter to Helly Nahmad, so he's obviously trying to curry favor. That's not a response from the Southern District.

In most cases, you get an independent appraiser and they say the appraisal provided by the defense is not correct.

THE COURT: Mr. Brafman, I think their response was in the wire intercepts themselves, Mr. Nahmad himself says this painting is really only worth $250,000, and if somebody came in off the street and bargained with me, I'd give it to them for $250,000, but we're going to sell it for 300 and this is the easiest $25,000 I've made.

That is the gravamen and the basis for their argument that there was a fraud. And I don't think they need an appraiser to make that point.

1    MR. BRAFMAN:  Yes, but most respectfully, if you

2  bought it in the gallery you would pay a 20 percent commission

3  and it would go back up to $300,000.  It's not a good

4  conversation, but when you decide when you sentenced Nicky

5  Hirsch is that it was an aberration.

6    THE COURT:  For mr. Hirsch.

7    MR. BRAFMAN:  Yes, I understand that, and for

8  Mr. Nahmad, as well, because in 3200 conversations, listening

9  to an art dealer, if there was one other instance where he

10  played fast and loose with an art person, you would have it in

11  their submission.  They would submit it to you to be heard.

12    If you listened to 3200 conversations by myself and

13  Mr. Shechtman you maybe wouldn't find a fraud but you would

14  find a lot of conversations that we would be embarrassed to

15  discuss in an open courtroom.

16    These guys know each other for 25 years.  And the

17  reason why I brought the transcript of that conversation, I

18  know your Honor has listened to it, I have the line sheets that

19  the government prepared.  With respect, I would like to be able

20  to hand it up to the Court because I'd like to walk you through

21  the conversation, the one conversation that they're asking you

22  to use, quite frankly.  Even though he didn't plead guilty art

23  fraud, they're asking you essentially to use this to find out

24  that he's a bad man.  It would only take a couple of minutes.

25  It's the government line sheet.

1        I'd ask you to, most respectfully, look at this.  I

2   haven't written on it, but I've highlighted a couple of

3   sections to save time so I can direct you, sir, to the section

4   that I think is very important for you to focus on.

5        THE COURT:  Mr. Brafman, I'm going to ask you again to

6   please slow down for the sake of the court reporter.  While she

7   may not have trouble hearing you, she may have trouble

8   following you, so please slow down.

9        MR. BRAFMAN:  Yes, sir.

10       THE COURT:  I have listened to this call.  So I'm

11  happy to use this to assist in your going over it, but I have

12  already listened to the call.

13       MR. BRAFMAN:  Yes, but I'm listening to this call

14  without, as Mr. Fischman says, a narrator telling you what

15  these two childhood friends are talking about, you don't

16  understand what they're saying.

17       For example, in the first highlighted section on the

18  first page, there is a reference, a couple of lines down.

19  There's one caveat that she wants to be put in.  And Helly

20  Nahmad says caveat is a Ben Steiner word.

21       Ben Steiner is a childhood friend who runs a hedge

22  fund who is an intellectual.

23       THE COURT:  I'm aware.  He submitted a letter on

24  Mr. Nahmad's behalf.

25       MR. BRAFMAN:  Yes, but I'm trying for you to

1   understand that this isn't a conversation with strangers.  This

2   is a conversation with two childhood friends who have been

3   doing this for 25 years, not bad things, but spoofing each

4   other.

5           If you look down to the second highlighted portion,

6   which doesn't get lost in the conversation or shouldn't, in the

7   middle of the conversation, Helly says "Whatever.  Of course,

8   nobody is looking to screw anyone," because there's a

9   discussion about what happens if she has to pay taxes.

10          But most important, Judge, if you look at the

11  following page, this is the part that I think is critical for

12  you to understand.  If you're going to use this conversation to

13  impose a jail sentence where you otherwise would not, you need

14  to understand this:  Every bad thing they said is a quote from

15  a movie.  We can show you the movie.  We could show you the

16  section, but let me at least read it.

17          The first one, "This guy is raping her for 50 on one

18  end.  We're burying her for the (unintelligible)."  If you

19  listen carefully, it says towels on the other end, not

20  unintelligible.  It clearly says towels.

21          In the movie "Casino," Robert De Niro is talking to

22  Joe Pesci and they're talking about a Japanese whale.  In the

23  casino business, a whale is someone who comes in with a

24  suitcase full of money and they lose it.  And he says, "This

25  guy is dropping two million in the casino and he's stealing the

E4ugnahs

1  towels from the room."  This is Nicky Hirsch and Helly Nahmad

2  talking to each other.  Movie language.

3        The second highlighted area where there is an

4  inaudible, I'm sorry, where it says "I know you raping me for

5  25, I'm taking (unintelligible).  I got to get the shit across,

6  I lose packages, I lose mean."

7        It's not "I lose mean."  It's I lose men.  This is a

8  conversation with Al Pacino in "Scarface" where he is talking

9  about the risks that a person takes when they're involved in

10  something stupid like this.  And that's a clear quote from

11  there.

12        When you look to the next highlighted place where they

13  talk about the word innovators, innovators is the word that's

14  used throughout the movie "Boiler Room."  When you look at the

15  end, "The system is designed to cheat and lie."  At the end,

16  that's from a move called "Margin Call."

17        What does Nicky Hirsch say to Helly?  Oh, Helly, you

18  are crazy.  At the end of the day, this is a crazy, stupid

19  conversation.  It's offensive, it's inappropriate.  And in the

20  conversation when you are confronted with somewhat of an

21  explanation by Mr. Hirsch's lawyer, your Honor concluded that

22  with respect to Nicky Hirsch, it was an aberration.

23        Your Honor, I understand that it's a bad part of the

24  case.  One, we didn't plead guilty to it.  We weren't convicted

25  of it.  You can think about it, you can consider it, but what I

1   think you need to do is not get focused, as the government has,

2   on language that if this were a trial and if there were a

3   witness and if Nicky Hirsch were being cross-examined, he would

4   concede that which I have said.

5       THE COURT:  Here is what I find particularly revealing

6   about this particular transaction.

7       In your submission, you have maintained, you have

8   tried to depict Mr. Nahmad as someone who, because he was

9   brought up in an environment and in a culture where betting was

10  a way of life, that he was taken with that and followed the

11  example of his father and he was into the rush and thrill of

12  the bet; it wasn't about the money, it was about the bet.  And

13  the reason he got involved in the gambling enterprise, or

14  whatever you want to call it, was he wanted even more of a rush

15  and he wanted teams to really root for and have the Super Bowl

16  be all the more important, okay?

17      That doesn't tell us why he did this nor it is

18  explained by greed, because this is a guy whose family, by all

19  accounts, is worth billions of dollars.  And he's in this

20  transaction, speaking when he doesn't know that anyone is

21  listening, and he's stealing $102,000, whatever it is, from a

22  woman who is in a vulnerable position, who presumably is not

23  worth billions of dollars simply because he can.

24      I don't know what that shows, if it shows that his

25  greed has no end or if it shows that he has absolutely no

1  respect for the rules, but what it does show is that it is not

2  about the thrill of the game, or if it is about the thrill of

3  the game, it's about the thrill of flouting the rules.  That is

4  what I think is revealing and what is troubling about it and

5  why I think the government has rightly emphasized it and why,

6  as you can tell, I am rightly troubled by it.

7        MR. BRAFMAN:  I don't doubt and I don't quarrel with

8  your Honor's ability to be troubled by it.  We were troubled by

9  it, but it cannot be the lynchpin of the case because at the

10  end of the day, if we ask for a hearing on this, what Nicky

11  Hirsch would tell you is that this was his attempt to make

12  money when he was flat broke.

13        It doesn't excuse it, and doesn't explain Helly.

14        THE COURT:  Let me clarify.  And Nicky Hirsch is not

15  worth $3 billion.

16        MR. BRAFMAN:  You're right.

17        THE COURT:  Based on the record that I saw of Nicky

18  Hirsch, it was aberrant conduct.  Based on the record I saw of

19  Nicky Hirsch, he was this a very different position than this

20  guy who is an internationally renowned owner of a gallery worth

21  billions of dollars who, when he sees an opportunity to make

22  $102,000 from a woman who is in a vulnerable position, he takes

23  that opportunity.  That, to me, is incredibly revealing.

24        MR. BRAFMAN:  I'd agree if you had more of the same,

25  if you had more of this.

E4ugnahs

1      THE COURT:  Why do I need more than one?

2      MR. BRAFMAN:  I'll tell you why.  I'll tell you why.

3  Because when you do something stupid, you don't always go to

4  jail if you've otherwise lived a very good life.  And this is

5  stupid.

6      There's no excuse.  And I can tell from the demeanor

7  of the Court that I'm not going to be able to convince you, but

8  at the end of the day, if you plead to a fraud, this is a

9  $25,000 fraud and the guidelines are substantially lower than

10  the guidelines in this case.

11      THE COURT:  Didn't Mr. Nahmad get $77,000?

12      MR. BRAFMAN:  There's no money at the end of the day.

13  He doesn't get anything.

14      THE COURT:  My understanding is that there was

15  $477,000 that, in exchange for wiring 177,000 of that to his

16  father, he gave $100,000 in cash domestically to the woman.

17      Is that true or not true?

18      MR. BRAFMAN:  It's not.  Mr. Nahmad did not give her

19  any money.

20      THE COURT:  He says in the call that he gave her

21  $30,000 already.

22      MR. BRAFMAN:  I'm telling you, Judge, there's no proof

23  that I'm aware of that Mr. Nahmad gave her any money.

24      THE COURT:  He kept all 177?

25      MR. BRAFMAN:  No.  It's difficult for me to explain

E4ugnahs

1    without going into areas that don't involve him.

2         THE COURT:  Why don't you move on to the next topic

3    because I don't think you're going to persuade me on that one.

4         MR. BRAFMAN:  I didn't think I was going to persuade

5    you on it.  What I want to try to do is convince you, sir, that

6    when you do the individualized assessment of the person as you

7    do in every case, that you not be so focused on one item as it

8    destroys the other very positive parts of his life.  And that's

9    really the hopeful objective here.

10        Your Honor, there is a four-point enhancement in this

11   case.  And I'm not getting caught up in the discussion as to

12   whether it's an appropriate enhancement or not because we

13   accepted it.  But to be perfectly candid with you and probably

14   because it's a seasonal discussion, I have walked around my

15   home and office for the last eight weeks asking myself why is

16   this leadership enhancement different from all other leadership

17   enhancements?  To be perfectly candid with you, it is.  Based

18   on what everything Mr. Shechtman and I have said, we're not

19   giving money to an illegal business.

20        When the money is given, when Mr. Nahmad invests

21   money, when he gives money, they are betting.  And I don't

22   believe that you commit a crime when a group of people bet.

23   And when he crossed the line and when he crossed the line,

24   there is no more infusion of money by Mr. Nahmad.  All of the

25   drafts or wires coming from his father, and we can go through

1  each of them, by the end of 2011, they all come, and they all

2  go to pay Helly Nahmad's gambling debts.

3        We said in our submission, and his father has said it

4  and his mother has said it, that it may not be a good idea to

5  pay your son's gambling debts because you are, in effect, an

6  enabler, but that is exactly what this is.  So, to the extent

7  we have a leadership enhancement which gets us to a higher

8  start, my concern is not where your Honor starts.  My concern

9  is where your Honor ends.

10        To the extent that you have the right, and we have

11  accepted it, that you have the right to view Helly as a leader,

12  I think you have to view him as a leader, but then again,

13  understand his limited leadership role.

14        I want to talk to you right now about HMS.  When I

15  first came into this case, I assumed Helly Nahmad was "H."

16  It's not.  HMS was a company started by Noah Siegel.  Noah

17  Siegel is a math whiz.  Helly Siegel is not a signatory on that

18  account.  He never been a signatory on that account.

19        Noah picked all of the bets.  There's no proof that

20  Helly picked any of the bets.  He asks.  He asks him who to

21  root for.  And when you discussed leadership, you focused on

22  this, and the government's response is coconspirators always

23  talk badly amongst each other or about each other.  That's not

24  what this is.

25        I ask your indulgence to give me a minute.  I want to

1    read the quote into the record that appears at page 20.

2              THE COURT:  Don't bother.  I have read it.

3              MR. BRAFMAN:  Your Honor, it demonstrates.

4              THE COURT:  Mr. Brafman, you've been going on for

5    probably upwards of a half an hour.  That's fine.  I already

6    read it.  You don't need to read it into the record.  To the

7    extent you want the press to read it, they can read it in the

8    record.  It's in the record.

9              Go ahead.

10             MR. BRAFMAN:  I don't want the press to read it.  My

11   only concern is you.

12             THE COURT:  I have read it.

13             MR. BRAFMAN:  Thank you.

14             The government's response is not adequate.  The

15   government says, well, all coconspirators talk about each

16   other.  That quote, which your Honor knows probably as well as

17   I do by now, suggests they are not cutting Helly out of the

18   bets, that he has no leadership role even though we have

19   accepted it.  We tell him who to pay.  We tell him who to pay.

20   It isn't a question, your Honor, of is he a leader or not.

21   Yes, he's a leader.  But when you assess leadership points, you

22   have a right, for the purposes of getting to the guideline

23   range, to take the four points.  But I suggest, with respect,

24   that you limit your analysis to see where is Helly in the terms

25   of being a leader when you have Noah, who works for him, saying

1    Helly calls me every day to find out what teams I am betting

2    on, I can't deal with it, he's supposed to be the boss

3    according to the government.

4         When they say look at the leadership, he is

5    questioning the salary of David Aaron who is a worker who your

6    Honor has already sentenced.  He runs errands for Noah.  He

7    picks up his cleaning.  He walks his dog.  And we're paying

8    him.  Helly is paying him, because Helly is the only one who

9    pays.

10        I want you to know, sir, most respectfully, that when

11   you have a question of sentencing parity, as you have in this

12   case, I think you need to understand where Noah Siegel fits

13   into the equation, because I don't think for a minute that the

14   government is right and I think we could prove it to you if we

15   had to.  It doesn't decrease Mr. Nahmad's importance in that

16   without money you can't bet.

17        Noah Siegel is the guy who figured out the algorithm,

18   he's the guy who picked the bets, he's the guy who signed the

19   checks, and he got 24 percent of every winning bet, not two

20   percent, not five percent, and he only had to pay five percent

21   on the loss.

22        We can compute it.  We can show you how it's computed.

23   That, your Honor, turns this on its head, because Noah had a

24   better deal than Helly when you do the math.

25        THE COURT:  The evidence at that sentencing, if I

E4ugnahs

1    recall correctly, is Mr. Siegel got three to five percent of

2    the bets that the enterprise booked, which is ultimately what

3    Mr. Nahmad pleaded guilty to and that Mr. Nahmad got something

4    upwards of 47 percent.

5              True or not true?

6              MR. BRAFMAN:  Not true.  Let Mr. Shechtman, who did

7    the math, answer it for you.  Not true.

8              THE COURT:  The question I had at the time was three

9    to five percent strikes me as high given that he's not playing

10   the same role as being the oracle in those cases because you're

11   just booking bets one against each other.  I ask you to explain

12   that.

13             MR. BRAFMAN:  It's not true.

14             MR. SCHECHTMAN:  Not true.

15             Judge, the percentages here were always the same.

16   Noah had 24 percent of the upside; four percent of the losses.

17   When they began booking in 2012, this group was down greatly.

18   Noah's edge had been lost because the sites got smarter than

19   him, so they started 2012 in the hole.

20             When you have a free roll like Noah, and you win, and

21   they won on the bets they booked, if you bet billionaires at 11

22   to ten, on balance, you're going to win.  As they won, Noah

23   crept up the enterprise.  The group crept up towards zero, but

24   until they broke even, Noah didn't get his 24 percent.

25             So, it's perfectly fair to say that as they moved to

1    what bettors call the high-water mark, Noah's share was only

2    four percent, but it's also true that had they crossed it, he

3    would have been back to 24.

4           The only thing that kept him at four was that they

5    were so much in the hole from 2011 losses, the 2011 losses pure

6    betting, that were financed.

7           Everybody I think is really telling you the same

8    story.  It's not like Mr. Brafman has misled you in any way,

9    but the percentages here were 24 percent on the upside, four

10   percent or five percent on the downside, but when you do it

11   that way, if you are losing and you then win, you don't get

12   your 24 cents until you are back to zero.  And he didn't get

13   back to zero until late in 2013.

14           MR. BRAFMAN:  When they were winning, if you look at

15   the records and you look at the checks that were cut, we have

16   done the math in our submission, Noah is getting a lot of

17   money.  Noah is getting a little less than Helly Nahmad.  But

18   to suggest that Noah, who didn't get a leadership role and got

19   probation, is less involved that Helly Nahmad I think is a

20   fiction as a practical matter.

21           It's not that I want Noah to get a worse sentence, but

22   this is in terms of sentencing parity.  In the government's own

23   submission, they say a couple of things which have nothing to

24   do with Helly.  Noah was involved in a whole bunch of

25   additional gambling that had nothing to do with Helly Nahmad

1    that the government would concede.

2         There's a Russian baseball betting company that Noah

3    formed.  Helly had nothing to do with that.  There are quotes

4    from Noah on the tapes, let's find crafty ways to lie to Helly

5    so that he doesn't know that we're doing this.

6         Noah is not a kid who just plays chess.  This would

7    never have happened without Noah, because the only reason Helly

8    hooked up with Noah, who he didn't know, is because Noah

9    convinced them that he had an edge, and he had an edge for a

10   while until the sites figured out that he was a sharp bettor.

11   Helly posted none of those bets and he shared in the winnings

12   when they were winning, and he paid the losses substantially

13   greater than Noah.  I am suggesting to you, Judge, that Noah

14   had a better financial arrangement in this case than Helly

15   Nahmad did.

16        Now, does it show Helly to be sophisticated and

17   crafty?  No.  It shows him to be a patsy because people know he

18   has a lot of money and they used him.  I submit to you, Judge,

19   that whatever else you want to conclude on the Noah part of the

20   case, we are 100 percent correct.  If you brought Noah back in

21   here and you asked him under oath, he would testify to what we

22   have just told you.

23        I have looked at the prior sentences in this case, and

24   people went to prison for a couple of things.  People went to

25   prison if, in fact, they were involved in violence, and your

1    Honor has made that very clear.  In the government's

2    submission, they're upfront and say, to their credit, that

3    there's no evidence whatsoever that Helly Nahmad had anything

4    to do with violence.

5           Then there are some people who went to jail, not all,

6    some people who went to jail because they had prior

7    convictions, like Eddy Ting, who has a prior conviction for

8    gambling.  It was like an in-your-face, I'm-doing-it-again, and

9    Your Honor sentenced him to jail.  There were two people, Moshe

10   Oratz, who had a prior conviction, spent several years in jail.

11   I think that your Honor, to your credit, gave him a very

12   compassionate sentence.  At the end of the day, you didn't send

13   him to prison.  He's on the phone 100 crossing with Helly.

14   He's a much more compulsive, addicted gambler than Helly

15   Nahmad.  I think your Honor gave him great credit for dealing

16   with it.  And I'll deal with Helly's gambling in a moment.

17   Barbalat had a prison sentence, and your Honor didn't send him

18   to jail.

19          We have a first offender who has never been in jail,

20   never been charged with a crime, even as a juvenile.  He has

21   family roots.  He is gainfully employed.  He's well-recognized

22   everywhere.

23          Let me respond to something that the government said,

24   which I think was somewhat painful.  Mr. Naftalis said you

25   don't have letters from friends.  Well, excuse me.  Everyone in

E4ugnahs

1    the art world where Helly lives 20 hours a day has become a

2    friend.  That's Helly's friends.

3          The fact that you don't have a lot of friends suggests

4    to you why his relationship with Nicky Hirsch is so close

5    because it's a high school friend.  You have people who work

6    for him telling you he's respectful, he's attentive, he's a

7    decent and honest boss.

8          You have people who he has helped dramatically buying

9    and helping buy a prosthetic leg for a friend who lost it.

10   There's a woman who worked for him who was caught stealing

11   twice.  She was battling addiction, and Helly didn't fire her.

12   Helly offered to help her go to rehab, he offered her a bonus

13   if she completed rehab.  I won't put her name in the record,

14   but I say, with great respect, that's a stunning letter.  That

15   letter tells you that Helly is a fundamentally decent guy.  He

16   tried to save this woman.

17         So, Mr. Naftalis, maybe when he gets older, maybe

18   he'll get it.  But you don't have to have letters from people

19   who are in their 20's and 30's who you hang out with on the

20   street because Helly spends his world in the art world.

21   Everybody in the art world has written about Helly and some of

22   these people, your Honor, are not people who you can take

23   lightly, your Honor.

24         We have people who have written to the Court who are

25   very impressive people from Sotheby's and from Christie's who

E4ugnahs

1    are world scholars who speak about his willingness to help

2    museums and to raise money for the environment.  He's a busy

3    guy.

4           To the extent that you don't have people who live next

5    door, there is a woman who lived next door who Helly helped

6    when she had to move as a widow.  There is a woman who lives

7    next door.  There is a friend whose leg was crushed and Helly

8    helped him.  There are people like the employees who say they

9    have become his friends.

10          Helly spends his entire days at the gallery, your

11   Honor, and the gallery doesn't end at 5:00.  There are

12   exhibitions.  There are shows.  There are auctions.  To the

13   extent that you have 65 letters, and I know you have read them,

14   so I'm not going to spend my time quoting, but Mr. Fischel, who

15   is the former dean of the Chicago Law School, he writes about

16   Helly.  He calls him one of the most trustworthy people that he

17   has ever met.  I don't think he would say that if he didn't

18   believe it, and I think that speaks highly about Helly.

19          There are people who talk to you about Helly and his

20   word is his bond.  Yes, I understand, your Honor, that it's

21   such in sharp contrast to the art tape they have pushed on you

22   and has become the focus, in a way, of this case, and that's

23   why I submit it's an aberration.

24          If you are a sharp, if you are a cheater, if you are

25   dishonest, these people would not be saying that in a public

E4ugnahs

1    record from auction houses that are among the most respected in

2    the country.

3            I want to talk to you for a moment, your Honor, about

4    Helly's gambling.

5            THE COURT:  I have indulged you for a very long time.

6    I indulged you filing not just a reply but a sur-reply.  I will

7    indulge you further because my view is sentencing is an

8    incredibly important thing and a defendant should have his say

9    and be heard, but I do want you to begin to wrap it up.

10           MR. BRAFMAN:  I am.  I give you my word that I am

11   wrapping it up, but there are a couple of areas that I think

12   you need to consider.

13           You have, sir, in a couple of occasions, spoken of the

14   respective defendants who have dealt with their gambling

15   problem:  The fact they have sought counseling, the fact that

16   they go to gambler's analysis.  We had him analyzed by a doctor

17   and we could have submitted a report that tells you he has all

18   of the indicia of compulsive gambling.

19           It's not necessary.  He has not gambled since the date

20   of his arrest.  That's more impressive than going to gamblers

21   anonymous.  That's someone, as a mature person, recognizing

22   where his gambling took him, and it took him to a place where

23   he never, in his wildest dreams, thought he would be.  World

24   condemnation, public humiliation, and he stopped gaming.

25           Helly didn't gamble because he needed money.  Helly

1   didn't gamble because he was an addict who couldn't control

2   himself.  He liked gambling.  Now it's become the worst thing

3   that's ever happened to him, so he stopped it.

4          I don't want to tell you that he's an addict.  I will

5   tell you that it suggests that he has all of the indicia at the

6   time of someone who is compulsive because you can listen to him

7   calling Noah 50 times a week asking him who to bet on, who to

8   root for, and that suggests to you they're talking about sharp

9   bettors and emotional bettors in the literature.

10         An emotional bettor bets on a team even if they

11  consistently lose because that's who they're rooting for.  This

12  is Helly Nahmad.  He wanted to know who to root for.  He never

13  understood the dynamics of what Noah was doing.

14         At the end of the day, yes, I'm sure that some of the

15  tabloids will write blame your dad.  He's not.  He's not.  The

16  fact is, and this is without dispute, that he grew up in a

17  different culture and he grew up in a culture where gambling

18  was legal, and gaming at high stakes was not only tolerated, it

19  was done on a regular basis.  His father tells you that in his

20  letter.  He's one of the finest men I've ever met and an

21  eloquent, extraordinary man who happens to be a world class

22  backgammon champion.

23         His mother, who is here in the courtroom, writes you a

24  letter in which she very cogently observes I never liked it, my

25  husband gambled like other people played golf or tennis, I wish

1    I had put my foot down.  And had she put her foot down, we're

2    not having this discussion, sir.

3            At the end of the day, gambling is not an excuse.  I

4    understand you said that in Mr. Zuriff's sentencing that while

5    you see how you can move from being a gambler to being a

6    bookmaker, gambling didn't make Zuriff a bookmaker.  Greed and

7    profit made Zuriff a bookmaker.

8            Helly liked gambling.  He got involved in this stupid

9    club because Noah convinced one of his childhood friends that

10   he had figured out an edge, and maybe, for the first time in

11   his life, he wouldn't be an emotional bettor.  And it blew up

12   in his face and it's an unmitigated disaster.

13           Your Honor, you have said in other cases, and I don't

14   know the exact quote, I'm drawing a blank, but I don't want to

15   suggest that Helly's adverse consequences are far superior to

16   anybody else's in this case because getting indicted is not

17   good and it's never fun and it always damages your image with

18   your family.

19           Sometimes it's really bad to be well known or rich.

20   Sometimes it's good.  Sometimes it's really bad.  Nobody has

21   suffered the embarrassment, the public humiliation here, across

22   the world, than Helly Nahmad.  When you Google him for the rest

23   of your life, he will be coming up as someone who is charged

24   with racketeering or money laundering, and that's a stain he

25   will carry for the rest of his life.

E4ugnahs

1          There's been a lot of writing here, and a lot of it

2     has been a joint effort.  A lot of it has been me editing

3     Shechtman, Shechtman editing me.  But there is one line that's

4     all mine, and I want to take, not credit for it, but I want to

5     say it.  There is a difference between being a felon and a

6     convict.  There is a difference, sir, between being a convicted

7     felon that Helly can do nothing about for the rest of his life,

8     the first person in the Nahmad family to suffer that

9     humiliation.  That's something he will have to explain forever.

10          You don't need to punish him further.  You don't need

11     to punish him so that others will learn.  Anyone who has seen

12     what Helly has gone through for the last year and the

13     humiliation, they know it, but I'm asking you to spare him a

14     prison sentence.

15          We have suggested to you a structured community

16     service, and let me tell you why, sir, and it comes from one of

17     your colleagues who said to me if you're asking a judge not to

18     sentence somebody to jail, give him something as an alternative

19     that is meaningful.  Helly, we don't have any dispute, he knows

20     art.  He does well with young people.  From the family letters,

21     everybody tells you that.

22          We have a program that is needed in New York and

23     there's been a recent "New York Times" article about it.  It's

24     not fantasy.  It's real.  It's not him buying his way out of

25     jail.  He's going to be chaperoning kids to museums.  He's

1    going to be teaching them in high schools.  He's going to have

2    them come to his gallery.  It's going to go on for as long as

3    you want it to go on and, indeed, it's probably going to go on

4    forever because Helly is going to start this and it's going to

5    become a real art project that will bring art into the world of

6    people who would never be exposed to this.

7              I want to say something of a personal nature.  I

8    learned more about art in the last year than I've known in my

9    entire life, but I have a daughter who is an artist and two

10   grandchildren who are artists, and I'll tell you what I

11   noticed.  When you expose a child to real art, to the beauty of

12   real art, it changes how they view the world.  It changes them

13   as people, and it makes them better people.  Helly has the

14   ability to do that.  There are people who need it and there are

15   people who have asked you to consider it.

16             THE COURT:  Mr. Brafman, why is it that not until he's

17   sitting in the well of a courtroom, about to face sentence, did

18   he not think to do that?

19             He has billions of dollars, world renowned expertise

20   in art and he has heretofore done nothing to expose

21   underprivileged kids to art until he has a proposal to make to

22   avoid a jail sentence.

23             MR. BRAFMAN:  Yes.  That's a good question.  Let me

24   say this:  It would not be fair or correct to say that the

25   Nahmad family has done nothing.

1    They have devoted their life and their fortune to

2  museums, to exhibitions.  They have led paintings and held

3  exhibitions for charities.  Helly raised $38 million almost

4  singlehandedly for the environment.  It's not as if he sat on

5  the beach and smoked cigars.  Helly has been one of the most

6  active young people in the art world.

7    Helly barely graduated high school.  He has no formal

8  education beyond high school.  Helly learned about art at his

9  father's side when he was a little boy.  And to his credit,

10  without real formal education, he has become one of the

11  foremost art forces in the world.

12    Yes, this is a good idea.  It's a good idea and it's

13  an alternative to incarceration.  Your Honor, I wish, why did

14  Noah Siegel start teaching chess after his arrest?  Because he

15  wanted to do something good to pay back.

16    We could have started this at the time of the arrest,

17  but with this uncertain future, your Honor, we spent more time

18  trying to understand the tapes than anything else.

19    THE COURT:  Mr. Brafman, doing good works in advance

20  of sentencing is as low-hanging fruit as it comes and he didn't

21  even pick it.

22    MR. BRAFMAN:  Judge, in fairness, we have been

23  discussing this for months, trying to get something done

24  through a bureaucracy, trying to get a person from a homeless

25  shelter to approve this.  You can't just walk in and say I want

1  to take 20 of your kids to a museum.

2      THE COURT:  No, but you can do what Mr. Siegel did,

3  which is give your time and your energy to devote to people who

4  have less than you and who are less fortunate than you.

5      MR. BRAFMAN:  Yes.

6      THE COURT:  I have seen nothing in the record that

7  Mr. Nahmad has recognized the virtues of that until he is

8  sitting in the courtroom and proposes this as an alternative to

9  jail.  It baffles me, to be completely honest.

10      MR. BRAFMAN:  To be perfectly candid with you, Judge,

11  we have someone who has, in this life, done very good things

12  for the world through his art expertise.  It's not fair to say

13  that he hasn't done anything for young people.

14      This is something that will do good now.  To the

15  extent that he hasn't done it before, it doesn't mean that he

16  hasn't done anything good before.  This is a proposal.

17      It's a proposal that me and Mr. Shechtman helped him

18  craft, not because we wanted to impress you only, but because

19  we thought Helly, with the kind of personality, with proper

20  supervision, would relate well to the program.

21      Look at the letter concerning the exhibition that

22  raised $38 million for the environment.  Helly is the guy who

23  put that together.  And when people who don't understand who

24  haven't done it, you hold an exhibition for a charity that

25  involves millions and millions dollars' worth of art, you're

1  dealing with insurance, you're dealing with transportation,

2  you're dealing with security.  It's a very big undertaking.

3  It's not writing a check.  It's not that he wrote a check for

4  $38 million to an environmental group.  He had museums take

5  paintings.  The Nahmad family's paintings are in museums all

6  over the world and Helly is involved in that.

7          You have Michael Steinhardt, who is perhaps one of the

8  greatest philanthropists in the city, and reason why his letter

9  is so compelling is no one is going to match him in terms of

10  philanthropy.  The reason it's compelling, and I'm about to

11  wrap this up because I can tell you want to get to the end, but

12  the reason why that's a compelling letter is because what does

13  he talk about?  He talks about Helly breaking down and

14  expressing his remorse and expressing his humiliation.

15          You have 58 people who have written to you who are

16  very important people in the community and everyone talks about

17  his shame, his humiliation.  One of the things that a

18  sentencing Court does and focuses on and should do and should

19  focus on is does the defendant get it.  And the answer is yes,

20  he gets it.  Yes, he gets it.  He has an understanding of what

21  he did that was wrong, and he's asking you not to send him to

22  prison.

23          THE COURT:  Can I ask you to address one thing in that

24  regard, which is something that you said you would address in

25  your most recent filing, which is the picture of Mr. Nahmad at

E4ugnahs

1    the Knick game with the baseball hat on.

2              MR. BRAFMAN:  To be honest with you, Judge, I'm glad

3    that you asked me.  I want to explain that.

4              I was angry when they sent you the picture and now I'm

5    delighted they have because it shows you, first of all, what an

6    unfair inference they were drawing.  I'm going to tell you the

7    truth as an officer of the Court.  If you want to swear me in,

8    I'm going to tell you the truth whether you swear me in or not,

9    because it's my obligation and I was involved in this incident.

10             Helly got arrested on April 19.  From April 19 until

11   the day of that basketball game, Helly Nahmad did not surface

12   anywhere.  You could not find him.  He was either in my office

13   or he was in his apartment sitting alone.  And it was very

14   unnerving to us, and it was scary.  And when I lecture on this

15   subject, I say one of the things we need to do is we need to

16   make certain that our clients are okay.

17             I sat Helly down and I said Helly, listen to me – it

18   was in Mr. Shechtman's office – Helly, listen to us.  You're

19   not going into trial until June.  We have 3200 tapes.  You

20   can't do this.  You can't go into a state of depression.  We

21   need you functioning.  We need you to work.

22             He said to me, here, I have tickets for the game.  I'm

23   not going.  I said Helly, go, it's a basketball game.  You're

24   not going like other defendants.

25             THE COURT:  To be clear, I'm not blaming him for going

E4ugnahs

 1   to a Knick game.  The Knicks may not be good, but it's not a

 2   crime to go to a Knick game.

 3          Can you address the hat.  The hat is the thing I found

 4   a little troubling, and I was actually aware of this at time as

 5   well, so it didn't require the government's submission.

 6          It's hard to tell from the picture, but according to

 7   "The New York Post" it was a king playing card hat.  The notion

 8   that he would wear that two weeks after being arrested in a

 9   case that involves allegations of illegal poker struck me as a

10   little bit surprising, let me put it that way.

11          MR. BRAFMAN:  Let me say a couple of things.

12          Judge, there have been various bail applications from

13   a number of defendants in this case who were indicted for

14   gambling who asked to be able to go to La Vegas to be able to

15   gamble.  And your Honor, much to my surprise quite frankly,

16   granted many of those applications.

17          To be perfectly candid with you, I saw that as

18   chutzpah:  You're indicted for gambling and you decide you

19   want to go to Atlantic City for poker because you're a

20   professional gambler.  I get it.  And I gave your Honor, quite

21   frankly at the end of the day, credit for doing that because

22   where they're going and what they're doing is not illegal.

23          Helly Nahmad came down.  I drove him to that game.  We

24   went together.  He was petrified that someone would recognize

25   him.  I told him Helly, wear a hat.  He grabbed a hat on his

1    way out.  I tell you, sir, as an officer of the Court that when

2    you look at that hat, it does not appear to you, it did not

3    appear to me, to be a playing card.  I'm smart enough and I'm

4    good enough to tell him Helly, that's a bad hat.

5            He grabbed a hat.  He has hundreds of hats in his

6    apartment that were either promotional items that he picked up

7    in Las Vegas when he played or in other places where gambling

8    was lawful.  It was not in-your-face.

9            I will also tell you, Judge, that nobody recognized

10   Helly Nahmad at the game.  Unfortunately, they recognized me

11   and Spike Lee.  That's how this stupid photo occurred.  But you

12   cannot, you cannot, sir, use it for a second to suggest that

13   Helly Nahmad was essentially saying I don't care.

14           That was the first day that Helly was out of his

15   apartment.  To be perfectly candid with you, his parents live

16   in Monaco.  He's not married.  He doesn't have any children.

17   Mr. Naftalis says he doesn't appear to have any real friends.

18   Mr. Shechtman and I have kept him alive for the last nine

19   months at times when we were having very difficult

20   conversations because of the degree of humiliation.

21           For him to go to a basketball game with his lawyer

22   even if at the end of the day the hat choice was bad, I tell

23   you, sir, that should not, I hope, enter into your equation

24   whatsoever; and if it does, then blame me.  Don't blame Helly.

25   Blame me.

E4ugnahs

1    I should have recognized it.  He should have

2  recognized it.  And if we did, it wouldn't have been on his

3  head, but a different hat would have been on his head.  And the

4  hat I had in my car that I would have given him if he didn't

5  have a hat is a hat I bought at the CIA on an exhibit that says

6  "deny everything," so it would have been worse.

7    THE COURT:  Why don't you wrap it up.

8    MR. BRAFMAN:  I want to read you two things that you

9  said.  It's one line.  It's not going to take a long time.

10    When you sentenced Mr. Oratz to a nonjail sentence,

11  you said prison would impoverish your community rather than

12  benefit it and impoverish our society rather than benefit it.

13    When you did not sentence Mr. Sall to jail – and I'm

14  not comparing them, I understand he's a very different man and

15  he's older and a veteran – but when you did not send him to

16  jail, one of the things your Honor said is I'm not certain that

17  I'm going to accomplish anything by adding another person to

18  the federal prison system.

19    Here is the bottom line, Judge.  You have the ability

20  to sentence Mr. Nahmad to prison, and I'm asking you not to, or

21  you have the ability to sentence him to a significant period of

22  probation, a significant period of home confinement, and a

23  significant period of structured, important community service

24  where you will get reports.

25    I think it would be an enlightened sentence.  I think

1   it would be a compassionate sentence.  It would be the kind of

2   compassion you used when you sentenced Mr. Oratz to a nonprison

3   sentence, even though he had a prior conviction.

4           Gambling is not great.  Gambling got him here.  And he

5   hasn't gambled in a year.  That speaks a lot about the need to

6   rehabilitate him.

7           The only possible reason that you would think of

8   imposing a prison sentence in my mind under 3553 is perhaps for

9   the issue of general deterrence.

10          I'm suggesting to you that whether Helly Nahmad goes

11  to jail for a couple of months or not is not going to deter

12  anyone from doing this because this is such a unique, different

13  case, and he's got so much potential.

14          I say again what I said at the end of the memo:

15  There's such a difference between being a felon and a convict,

16  and I'm asking you not to make him a convict.  Even if it's for

17  a brief period of time, I'm asking you not to make him a

18  convict.

19          Thank you for your indulgence.

20          THE COURT:  Thank you.

21          Mr. Nahmad, is there anything that you wish to say

22  before I impose sentence?

23          Would you please speak into the microphone.

24          THE DEFENDANT:  Your Honor, I am ashamed.  My family

25  is a private family and I've brought dishonor to it.  We are a

1  proud family and I brought the spotlight of the media on all of

2  us because of my illegal actions.

3         No matter -- no matter what your sentence today, I

4  will never forgive myself for what I have done.  Others who

5  love me may forgive me.  I will not.

6         Gambling, your Honor, has always been a part of my

7  life.  As a child, I watched my father, my friends gamble, play

8  poker, backgammon, gin.  My father played those games for high

9  stakes.  It was a part of his life, just as the art business

10  was.

11         I so deeply regret that I let my betting, it was

12  almost an addiction, cross the line into my being part of

13  illegal gambling.  I knew we were no longer just betting and I

14  should have stopped.  I didn't -- I didn't and I only have

15  myself to blame.

16         I have learned a very, very -- I have learned a very,

17  very hard, humiliating lesson, a humbling one.  I no longer

18  gamble.  I work harder than ever in my art business in the hope

19  of restoring my good name.

20         I am committed, I am committed, your Honor, I am

21  committed to giving back to the community, to sharing my love

22  of art with others.

23         And I pray that you will allow me to remain in the

24  community and repay the debt that I owe.  I will not disappoint

25  you.

E4ugnahs

1          Thank you.

2          THE COURT:  Thank you very much.

3          Counsel, is there any reason why sentence should not

4    be imposed at this time?

5          MR. BRAFMAN:  No, your Honor.

6          MR. NAFTALIS:  No, your Honor.

7          THE COURT:  In imposing sentence, I am required to

8    consider the factors set forth in Title 18, United States Code,

9    Section 3553(a).  These include:  First, the nature and the

10   circumstances of the offense and the history and

11   characteristics of the defendant; second, the need for the

12   sentence imposed to advance the purposes of sentencing, namely

13   to reflect the seriousness of the offense, to promote respect

14   for law and to provide just punishment for the offense, to

15   afford adequate deterrence to criminal conduct, to protect the

16   public from further crimes of the defendant, and to provide the

17   defendant with needed education or vocational training, medical

18   care or other correctional treatment in the most effective

19   manner; third, the kinds of sentences available; fourth, the

20   guidelines range, which I have found to be 12 to 18 months in

21   prison; fifth, any pertinent policy statement; six, the need to

22   avoid unwarranted sentencing disparities among defendants with

23   similar records who have been found guilty of similar conduct;

24   seventh, the need to provide restitution to any victims of the

25   offense.

1    Ultimately, I am required to impose a sentence that is

2  sufficient, but no greater than necessary, to comply with the

3  purposes of sentencing that I mentioned a moment ago.

4    I am not going to hide the ball here.  Let me start by

5  saying that I am convinced beyond any doubt that a sentence

6  that would be sufficient, but no greater than necessary to

7  comply with the purposes of sentencing includes a term of

8  incarceration.  That is principally, but not solely, to respect

9  for law, but also to afford adequate deterrence and not just

10 generally, but also to Mr. Nahmad.

11   Number one, what Mr. Nahmad did here was significant.

12 He played a significant role, whether it was confined to

13 providing leadership through his money or leadership otherwise.

14 And I'm inclined to think the calls cited by the government

15 show that it went beyond just providing money.  He played a

16 significant role in long-standing, real criminal conduct.  Now,

17 it may not be quite as much as he was initially charged with,

18 but it is real and it is serious.

19   Second, whether the government or the defendant has

20 the better of the argument about the nature and extent of other

21 conduct or conduct prior to 2012, and I'm inclined to think the

22 truth lies somewhere in between, the record reveals to me that

23 the defendant has contempt for the rules that apply to everyone

24 else and to those who are vulnerable.

25   In that regard, I find two things significant:  One,

1  the call with Mr. Zuriff that is cited in the government's

2  submissions, and more significantly, as I mentioned already,

3  the transaction involving the Dufy painting, the latter of

4  which I find incredibly telling.

5      With respect to the former, I'm inclined to think that

6  the government's interpretation of that call is right; that he

7  was, in fact, preying on someone who had just been released

8  from rehabilitation.  But regardless, what is revealing to me

9  is that the way in which Mr. Nahmad speaks of the person with

10  Mr. Zuriff, whether he was quote/unquote, a beard or not.

11      He says, quote, "What I want you to understand, we

12  knock this guy off for one million bucks.  His dad is a

13  multibillionaire.  He himself had to have his brother bail him

14  out without tapping into his trust without his dad finding

15  out," unquote.

16      Mr. Nahmad is a person who, as far as I can tell, has

17  had every single advantage in life:  A loving family, more

18  money than anyone could possibly want or need, and that is the

19  way he talks about another person, whether as a beard or

20  otherwise, strikes me as incredibly revealing.

21      Even more revealing is the conduct with respect to

22  painting we have already discussed.  Again, I think it's pretty

23  clear that Mr. Nahmad took advantage of the woman involved,

24  took advantage of her ignorance.  And the way that he speaks of

25  her, whether it is quoting from movies or otherwise, is just

1  stunning to me; that they are going to rape her for $50,000;

2  that the system is, quote, "designed for some sort of equality

3  services for you know, there's some sort of equality, so the

4  only way to create inequality is to circumvent the system, and

5  the only way to circumvent the system is to cheat and lie,"

6  unquote.

7  I asked for the tape of that call because I wanted to

8  hear for myself, to decide for myself, whether Mr. Nahmad was

9  being sincere or, as the defense has argued, whether he was

10  quote/unquote spoofing.  Having listened to it, I have no

11  question that he was being sincere.

12  Having reviewed the record in this case, I have no

13  doubt that that sentiment is consistent with Mr. Nahmad's view

14  of the world, at least when he thinks that no one is watching,

15  when he's not operating in the high-flung world of

16  international art-dealing and that he can take advantage of the

17  situation.  That latter case is revealing and significant to me

18  for a couple of reasons that I have already hinted at.

19  In the sentencing submission, as I mentioned,

20  Mr. Nahmad argues that the reason he engaged in betting was the

21  thrill of the game.  Now, mind you, I don't think that explains

22  the bookmaking because the whole point of bookmaking is, as the

23  defense's submissions have argued, is to hedge and to avoid

24  taking a stake in the game.  Be that as it may, it certainly

25  does not explain the conduct involved with the painting because

 1  there's no nexus to sports at all.

 2          It's also hard to imagine, as I mentioned before, that

 3  he did so because he had any need or desire for financial gain.

 4  While $100,000 may be significant money to many people in the

 5  world, it is not significant to Mr. Nahmad.  It is hard to

 6  avoid the conclusion, therefore, that he did it for any reason

 7  other than the thrill he takes in breaking the rules or in

 8  taking advantage of someone who is vulnerable to being taken

 9  advantage of.

10          Now, I want to say that the defendant's sentencing

11  submission did not persuade me otherwise.  And, indeed, I was

12  troubled by many of the same things that the government was

13  troubled by.  Number one, I think it does minimize his

14  culpability in this case.  I think it does attempt to shift

15  more of the blame onto Mr. Siegel than is warranted.  As far as

16  I know, based on the record that I have seen throughout this

17  case, I think it does minimize, maybe somewhat unfairly, but

18  not altogether fairly, the other crimes that Mr. Nahmad was

19  engaged in.  Again, I think the painting situation is the most

20  telling.

21          This admission states bluntly there was, quote, "No

22  fraud here," unquote.  I find that claim an astonishing one and

23  it suggests to me that Mr. Nahmad - or his lawyers or both, but

24  certainly Mr. Nahmad is on the hook for it - just doesn't get

25  it.  And whatever Mr. Brafman may say that he does get it, he

E4ugnahs

does not get it, because whatever ambiguity there is about the

price of that painting, there is no ambiguity in my mind that

what they did in that case was fraud.  That is why Mr. Hirsch

pled guilty to fraud, that is why he was sentenced to fraud,

and the fact that he received a different sentence is a

function of the particular circumstances and individualized

circumstances of his case, but to say there is no fraud here is

an astonishing and truly significant claim to me.

Second, I was deeply troubled, as I think I have

already made clear, by the proposal that he be sentenced to

community service by giving $100,000 a year to a program that

would expose underprivileged youth to art.

To me, to sentence him to something that he professes

to love, to allow him to use his family's wealth to bail him

out of this trouble that he's in would not be punishment.  It

would not promote respect for law; it would breed contempt for

law.

As I already think I've made clear, it is revealing to

me that Mr. Nahmad did not do any of this and, in fact, has

still not done any of this but is merely proposing he do this

as part of a sentence to avoid serving time in jail.  In that

regard, he is very different from Mr. Siegel who spent the time

under the radar, not in the media's scrutiny, working with

children, working with underprivileged children to teach them

chess and gave his time and effort even at times when his

1   lawyer wanted to meet him as his lawyer said at sentencing.

2   Mr. Nahmad has not done any of that, despite the fact that, as

3   I said, I think that's about as low-hanging fruit as it gets.

4           I also did find significant what Mr. Naftalis

5   mentioned before that there were 65 letters in this case and

6   not a single letter attested to good works that Mr. Nahmad did

7   for those less fortunate and privileged than him, even with the

8   exception of that one charity auction, perhaps, to

9   philanthropic contributions, which would not have been

10  especially difficult for him to make.

11          I read those letters with keen interest.  I read every

12  single one of those letters.  The vast majority are from

13  figures in the art world and from employees, all of whom have

14  some reason to curry favor with Mr. Nahmad and his father, who,

15  by their own account and by the account of every one of those

16  letters, are clearly among the most powerful people in the art

17  world.

18          Aside from the references to the kindness he showed

19  that one employee with the substance abuse problem and the

20  charity auction at Christie's and the instance with the

21  prosthetic leg where Mr. Nahmad lent his services to raising

22  $40,000 to assist him, there is literally no mention, even by

23  writers who identify themselves as involved in charitable

24  causes, there's no mention of Mr. Nahmad's involvement in or

25  contributions to those less fortunate, not a single mention.

E4ugnahs

1  As I said, that is about as low-hanging fruit as it gets and

2  Mr. Nahmad didn't even pick it, and that, to me, is incredibly

3  revealing.

4        Mr. Brafman, at the end of his remarks, made

5  particular reference and emphasis on the sentences I imposed on

6  Mr. Sall and Mr. Oratz.  I actually think the distinction of

7  those two are quite telling here.

8        Mr. Sall, for one, although he was charged relatively

9  high in the indictment, he pled guilty basically to taking

10  money for legitimate investments that he understood was at

11  least, in part, dirty.  And I made the judgment that based on

12  that conduct and the full record in that case, which included

13  the fact that he had medical issues, that he's 69, that he is a

14  veteran of this country, and that the record was replete with

15  letter after letter after letter about the help, aid and

16  services that he has offered to those who are less fortunate

17  that a jail sentence would not be appropriate.

18        Mr. Oratz, I learned something after that sentencing

19  that I wish I had known about at that sentencing, but at the

20  time of the sentencing, if you look at the letters submitted on

21  Mr. Oratz' behalf and you contrast them to the letters

22  submitted on Mr. Nahmad's behalf, that contrast is unbelievably

23  telling, because the letters submitted on Mr. Oratz' behalf

24  depict him as one of the most generous and other-regarding

25  people.  They depict him as having changed significantly from

1  his prior conviction and sentence.  They depict him as giving

2  selflessly to other people.  And there is not a single letter

3  in this record that makes Mr. Nahmad out in that way, and that,

4  to me, is incredibly telling.

5       The bottom line is I think there is only one way for

6  Mr. Nahmad to understand that his actions have consequences, to

7  deter him from breaking or bending the rules and taking

8  advantage of other people in the future, and that is not to cut

9  him a break and allow him to spend more of his family's money

10 to avoid prison.  It is to send him to prison.

11       Having said that, I will now announce the sentence

12 that I intend to impose.  Mr. Nahmad, would you please rise.

13       THE DEFENDANT:  Yes, sir.

14       THE COURT:  Mr. Nahmad, it is the judgment of the

15 Court that you are remanded to the custody of the Bureau of

16 Prisons for one year and a day to be followed by a period of

17 three years of supervised release.

18       During your term of supervised release, you will be

19 subject to the following mandatory conditions:  You shall not

20 commit another federal, state or local crime.  You shall not

21 illegally possess a controlled substance.  You shall not

22 possess a firearm or destructive device.  You shall refrain

23 from any unlawful use of a controlled substance and submit to

24 one drug test within 15 days of release on supervised release

25 and at least two periodic drug tests thereafter as determined

1     by probation.  You shall cooperate in the collection of DNA as

2     directed by probation.

3          In addition, the standard conditions of supervised

4     release shall apply.  And you must also meet the following

5     special conditions:  You shall perform 300 hours of community

6     service as approved by probation.  I am not going to require

7     that you do what you proposed as an alternative to prison, but

8     I would strongly urge you to do that because it is a good thing

9     for the world, and you should do it because it is a good thing

10    for the world.

11         You shall submit your person, residence, place of

12    business, vehicle or any other premises under your control to a

13    search on the basis that the probation officer has a reasonable

14    belief that contraband or evidence of a violation of the

15    conditions of supervised release may be found.

16         The search must be conducted at a reasonable time and

17    in a reasonable manner.  Failure to submit to a search may be

18    grounds for revocation.  You shall inform any other residents

19    that the premises may be subject to search pursuant to this

20    condition.

21         You shall participate in a gambling addiction

22    treatment program as approved by the probation department.  You

23    shall contribute to the cost of services rendered; that is, to

24    make a copayment in an amount determined by the probation

25    officer based on your ability to pay or the availability of

1   third-party payment.  I authorize the release of available

2   mental health evaluations and reports to the healthcare

3   provider.

4        You shall provide the probation officer with access to

5   any requested financial information if you have not satisfied

6   your forfeiture obligations, your fine or your special

7   assessment.  You shall not incur new credit charges or open

8   additional lines of credit without the approval of the

9   probation officer unless you have satisfied your financial

10  obligations, as well.

11       You are to report to the nearest probation office

12  within 72 hours of your release from custody.  You shall be

13  supervised in the district of your residence.

14       I also order you to pay a fine of $30,000 which shall

15  be due and payable immediately.  I'm imposing the mandatory

16  special assessment of $100, which is also due and payable

17  immediately.

18       I also find that pursuant to the terms of my order

19  entered November 12, 2013, you are to forfeit to the United

20  States $6,427,000 in United States currency and all right,

21  title and interest in the painting *Carnaval à Nice,* 1937, by

22  Raoul Dufy, which represents the property you obtained directly

23  or indirectly as a result of or used to facilitate your

24  criminal conduct.  That obligation shall be joint and several

25  with that of your codefendants.

E4ugnahs

1    Mr. Brafman, I take it the forfeiture obligations here

2   have already been satisfied.  Is that correct?

3    MR. BRAFMAN:  Yes, your Honor.  Could we have 24 hours

4   to pay the fine so we can make the arrangements.  I don't think

5   we can do it this afternoon.

6    THE COURT:  I will modify my sentence to say that the

7   fine is due within seven days of entry of judgment.

8    MR. BRAFMAN:  Thank you.

9    THE COURT:  Does either counsel know of any legal

10   reason why the sentence shall not be imposed as stated?

11    MR. NAFTALIS:  No, your Honor.

12    MR. BRAFMAN:  No, your Honor.

13    May we request that the defendant be permitted to

14   voluntarily surrender.  It is recommended by probation.

15    THE COURT:  We're not there yet, but Mr. Naftalis.

16    MR. NAFTALIS:  No objection.

17    THE COURT:  The sentence as stated is imposed.  I find

18   that the sentence is sufficient, but no greater than necessary,

19   to satisfy the sentencing purposes set forth in Section

20   3553(a), including the need to promote respect for law, as I

21   said, and to provide just punishment for the offense and to

22   afford adequate deterrence.

23    Mr. Nahmad, I understand that the sentence is probably

24   very disappointing to you, and I am sorry for that.  But as I

25   said, I think it is absolutely necessary for the reasons that I

1   articulated for you to understand that your actions do have

2   consequences and that you can't gamble with $10 million and

3   then expect somebody to just bail you out; that if you commit a

4   crime, if you cross the line, that you have to pay those

5   consequences and understand that they will be real

6   consequences.

7           I tell you that because, in part, when you get out and

8   you're on supervised release, you better comply with the

9   provisions of supervised release.  If you find yourself back in

10  front of me displaying the same sort of contempt for rules that

11  I feel that you have shown before, then you will suffer even

12  further consequences; and I would like you not to do that and

13  not to put me to that choice.

14          I will allow the defendant to voluntarily surrender.

15  He shall surrender for service at the institution designated by

16  the Bureau of Prisons on or before 2:00 p.m. on June 16, 2014

17  or as notified by probation or the pretrial services

18  department.

19          If you do not receive notice of the designated

20  facility to which you are to surrender, Mr. Nahmad, you must

21  surrender to the Metropolitan Correctional Center by 2:00 p.m.

22  on that same date.

23          Your conditions of release are continued up until the

24  time you report to begin your sentence.  If you fail to report

25  for your sentence, you may be charged with an additional

E4ugnahs

1  criminal offense and face a sentence above and beyond what you

2  have just received.

3      Mr. Naftalis, are there additional counts to be

4  dismissed at the time?

5      MR. NAFTALIS:  Yes.  We move to dismiss all open

6  counts.

7      THE COURT:  All counts other than Count Nine naming

8  Mr. Nahmad are dismissed with respect to Mr. Nahmad.

9      Mr. Nahmad, to the extent that you have not given up

10 your right to appeal, your conviction and sentence through your

11 plea of guilty and the plea agreement that you entered into

12 with the government in connection with that plea, you have the

13 right to appeal.  If you are unable to pay the costs of an

14 appeal, you may apply for leave to appeal *in forma pauperis.*

15 Any notice of appeal must be filed within 14 days of the

16 judgment of conviction.

17     Is there anything further we need to deal with,

18 Mr. Naftalis?

19     MR. NAFTALIS:  Not from the government, your Honor.

20     THE COURT:  Mr. Brafman, do you have any requests with

21 respect to the location or designation location?

22     MR. BRAFMAN:  Yes.  I would request that the Court

23 recommend that the defendant be permitted to serve in the camp

24 in Otisville for religious and dietary reasons.

25     THE COURT:  Assuming that he is otherwise qualified

E4ugnahs

1  for that facility and because of the reasons that Mr. Brafman

2  has cited, as well as proximity to his family, I would think

3  that would be an appropriate place for him to be.

4      It's not my prerogative ultimately to make the

5  designation, as you know, but, again, I do think that given the

6  religious reasons and given the proximity to family, a location

7  near New York, perhaps Otisville, would be appropriate.

8      Is there anything further, Mr. Brafman?

9      MR. BRAFMAN:  No.

10     THE COURT:  We are adjourned.  Thank you.

11     (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25